**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

FILED
2012 MAR 27  AM 8: 36
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

**TERRI K. OLIVER,**

**Plaintiff,**

-vs-                                                   **Case No.  A-10-CA-821-SS**

**TEXAS HEALTH AND HUMAN SERVICES
COMMISSION and its Executive Commissioner,
THOMAS SUEHS, in his official capacity,**
                                          **Defendants.**

---

# O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendants Texas Health and Human Services Commission and Thomas Suehs (collectively, HHSC)'s Motion for Summary Judgment [#14], HHSC's Corrected Motion for Summary Judgment [#18], Plaintiff Terry K. Oliver's Response [#20] thereto, HHSC's Reply [#21], and Oliver's Sur-reply [#22]; and HHSC's Supplemental Memorandum [#29] and Oliver's Response [#30] thereto.  Having considered the documents, the file as a whole, and the relevant law, the Court enters the following opinion and orders, GRANTING summary judgment for HHSC.

## Background

This is a federal-question case, in which the Plaintiff, Terry K. Oliver, a former employee of Defendant HHSC, alleges violations of the Rehabilitation Act (RA), Americans with Disabilities Act (ADA), and the Family and Medical Leave Act (FMLA).  Oliver began working for HHSC as an Associate Counsel, at the Attorney IV level, on October 1, 2008.  Oliver was assigned to the Sanctions department of the Chief Counsel's Office.  The Sanctions department is charged with

pursuing administrative enforcement actions against private healthcare providers who receive public funds (such as Medicare and Medicaid).[1] HHSC admits that "[a]t the time she was hired, Oliver was an experienced attorney with a valid license to practice law in Texas and a number of years of service at a variety of Texas state agencies." App. to Defs. Mot. for Summ. J [#14-4] at 1 [hereinafter "App."].[2] As is not uncommon for state agencies, HHSC has a six-month probation period for new employees, during which the agency reserves the right to terminate the new employee without advance notice or cause.

Oliver was under the direct supervision of two intermediate management layers: (1) the "peer 'Team Lead,'" role filled by fellow Attorney IV, Barbara Jordan, and (2) the Director of Sanctions, a position initially held by Michael Garbarino, and latterly by Fread Houston. Id. at 1 & n.1. The Director was (and is), in turn, under the supervision of the Chief Counsel for the Office of Inspector General, Karen Nelson.

## I.    Oliver Applies for a Promotion

One month after she began working for HHSC, Garbarino, the Director of Sanctions, left that position. Nelson, the Chief Counsel, then posted the position as available. Oliver approached Nelson, and expressed a desire to apply for the position. The parties dispute what Nelson's reaction was. In her deposition, Oliver opined that Nelson encouraged her to apply. Id. at 22–23. In her declaration, Nelson asserts that she informed Oliver that she did not normally promote employees who had yet to demonstrate six-months competence on the job. Nelson opined her words were not

---

[1]Oliver worked alongside several other attorneys with essentially the same duties, two of whom had been hired at approximately the same time.

[2]Both sides rely on the extensive evidentiary appendix, supplied by HHSC along with its initial motion for summary judgment, and both sides cite to global page numbers assigned across all documents within it. The Court does likewise.

an encouragement, but were "more of a discouragement." *Id.* at 66. In her declaration, Nelson did admit Oliver met the minimum qualifications, and thus was considered for the position, in spite of her short time with the department. Oliver, in fact, was one three individuals granted an interview for the job.

The parties again diverge somewhat in their accounts of the interview. The interviews were conducted before Nelson and the Sanctions department attorneys. Oliver described the interview as feeling like a "sham," and pointed at the nature of the questions asked her, which, in her opinion, were more related to personal opinions than practical work experience. She compared this unfavorably with her experience in her initial interview for the Attorney IV position. By contrast, Nelson declared that all three candidates were asked the same questions, and that the interviews all followed the same procedures. She asserted all three candidates were scored by their potential future employees, and Oliver's scores were lower than those of Fread Houston, the candidate chosen for the position. She also explained, apparently as a standard part of the interview process, that all the attorneys were asked afterward whether they believed the could work effectively under each candidate's leadership, and "every single attorney on my staff indicated that he or she did not want to work under the leadership of Ms. Oliver." *Id.* at 66. Nelson's account of the interviews, including her assertion that the same questions were asked of all candidates, is corroborated by multiple affidavits from other HHSC attorneys. *Id.* at 244, 247, 253.

## II.   Reporting Absences and Leave

Like all HHSC attorneys, Oliver was required to track leave time and hours worked, through a program known as "AccessHR." This program by default records the employee as working whatever hours he or she is scheduled to work that week. Employees must affirmatively enter any

absences, and designate whether the missed hours should be deducted from sick, vacation, or holiday leave balances.  In other words, if the employee misses work, but fails to record the absence in AccessHR, the computer records will show the employee as having worked that day.  In December, Nelson began to suspect that Oliver was not documenting her absences properly.  In an attempt to verify Oliver's attendance, she had building security generate a report showing when Oliver's security badge had been used to gain access to the building.  This report apparently showed several days in November and December 2008 for which no entry by Oliver was recorded.  Nevertheless, AccessHR did not reflect any leave taken by Oliver for those days.

Even after Nelson additionally reviewed (1) Oliver's computer records, (2) a manual entry log for employees who arrive at work without badges, and (3) Oliver's Outlook calendar, and after crediting Oliver as having worked on any days indicated in those sources, she nevertheless could not account for some 140 hours—more than three weeks—of time, in which Oliver apparently was absent from work, without providing any notice, and without documenting any absence or leave taken.  *Id.* at 71.

Oliver testified at her deposition that she understood HHSC's policy was for each employee to "swipe" his or her badge upon entering the building; i.e., to always swipe the card, even if doing so was not necessary to physically gain entry, such as when closely following another employee. *See* App. at 39.  She further admitted that she attempted to comply with the policy at all times. *Id.*

## III.   Sleeping at Work

During the same time period, Nelson also became aware that Oliver was sleeping at work. She personally observed Oliver, wrapped in a blanket, sleeping at a training session on December 4, 2008. App. at 66.  Nelson was subsequently informed by two HHSC attorneys of further sleeping

episodes, in which Oliver was sleeping in her office. *Id.* at 67, 247. In affidavits, several HHSC staff attorneys or other employees declare Oliver was observed, variously: (1) asleep on the floor of her office with pillows and a blanket, *id.* at 243, 246, 249; (2) sleeping on a pallet under her desk, *id.* at 252; (3) sleeping in one of her guest chairs, while wrapped in a blanket, *id.* at 243, 246; (4) sleeping on a break-room sofa, *id.* at 244, 252; and (5) at her desk, with her head resting on her arms, as if asleep, *id.* at 249. That Oliver was in fact asleep on at least some of these occasions is confirmed by the fact she is reported to have been heard snoring. *Id.* at 243, 246, 252. Similar allegations of sleeping were made to Nelson in an anonymous memo, dated January 20, 2009.[3] *Id.* at 138.

## IV.    HHSC's Reaction

As discussed more thoroughly below, on January 5, 2009, Nelson met with Oliver to discuss the sleeping, absences, and leave-reporting issues. It is undisputed that Nelson warned Oliver that failure to correct these problems could result in disciplinary activity, including dismissal. *Id.* at 68, 160. Despite agreeing to correct the various problems, and particularly agreeing to retroactively enter correct AccessHR entries, Oliver subsequently failed to do so. Significantly, Nelson advised Oliver to make an accommodation request, if any of her sleeping problems were due to medical issues. However, Oliver declined to do so. Garbarino apparently gave Olive similar advice two days later, in a follow-up meeting.

Oliver finally initiated disability accommodation discussions, via a letter, on January 20, 2009. *Id.* at 139. This letter reported a slew of previously unreported health problems, albeit without medical documentation. *See id.* at 70, 139–47. It was Oliver's first notice to HHSC of anything

---

[3]An updated version of the memo, dated January 29, 2009, makes additional, but irrelevant, allegations.

which might constitute a disability.  As recounted in a letter from Donna Bragdon, an ADA Specialist with HHSC, although Oliver did provide medical documentation of her condition, on April 14 she stated she was ready to return to work, and, in the words of Bragdon (and undisputed by Oliver), "the reasonable accommodation process was not appropriate for [Oliver's] needs." *Id.* at 285.  Accordingly, her request was administratively closed on May 1, 2009.  *Id.* at 284–85.

The next day, on the morning of January 21, 2009, Oliver apparently collapsed at work in front of another HHSC employee.  Oliver was sent to the emergency room.  The record does not reflect the precise nature of what happened, but it was apparently a serious "cardiac event" of some kind.  Nelson and Jordan compiled FMLA paperwork for Oliver, and Jordan brought it to her in the hospital.  Pursant to the FMLA paperwork, Oliver obtained a medical certification from Doctor Steven Margolin, dated March, 9, 2009, stating she was unable to perform any kind of work until June 20, 2009, in part because of "severe dyspnea, dizziness, and possible syncopal episodes," (blacking out) and because she was "undergoing cardiac rehabilitation under the close monitoring of her cardiologist." *Id.* at 176.

On January 27, Nelson obtained authorization to extend thirty days paid leave to Oliver, as she had apparently exhausted all other paid leave.  However, Nelson also sent a memorandum to Oliver on the same day, reminding Oliver of the performance issues, particularly the need to account for the prior absences, and giving Oliver a deadline of February 11, 2009, to do so.  Nelson directed Oliver to direct future communications to Houston, who at that point was Oliver's direct supervisor.

At the same time, Nelson attempted to follow up to obtain a full accounting from Oliver for the apparently unreported absences.  Oliver was allowed to return to the office, albeit briefly, and with Houston looking on, to search her desk and computer for documentation.  On February 11

Oliver supplied a partial response, and on February 22, eleven days after the deadline set by Nelson, Oliver, provided further responses to Nelson's request for an accounting for apparent absences which occurred prior to January 20, 2012).  In her responses, Oliver generally complained about the methodology regarding calculation of absences, and blamed Nelson for making it impossible to respond fully.

On March 23, 2009, Oliver abruptly returned to work.  She submitted three return-to-work certifications from her various doctors, including one from Doctor Margolin dated March 12, 2009—a mere three days after he had certified she was unable to do any kind of work.  However, after approximately two hours, Houston had Oliver escorted from the building by security, citing a need to review Oliver's releases, because of the apparent discrepancy in whether she indeed was medically cleared for duty.[4]  Nelson extended an additional period of unpaid leave shortly thereafter.

After twelve weeks had passed, during which time Oliver was variously on unpaid leave, or paid emergency leave, HHSC terminated her employment on April 16, 2009.[5]  *Id.* at 282.

Oliver asserts her termination constitutes retaliation and discrimination under the ADA, RA, and FMLA.  She further asserts she was harassed for her disability, based on vaguely referenced comments made by Nelson and co-workers prior to January 20. She also claims HHSC failed to reasonably accommodate her limitations under the ADA and RA, and failed to engage in the requisite accommodation process or dialogue.  Finally, she asserts denial of her FMLA rights to

---

[4]The FMLA authorizes employers to have a "uniformly applied practice or policy that requires each such employee to receive certification from the health care provider of the employee that the employee is able to resume work," as a condition precedent to restoration after FMLA leave. *See* 29 U.S.C. § 2614(a)(4).

[5]In its pleadings and supporting affidavits, HHSC makes much of other relatively innocuous actions or activities by Oliver, from both before and after January 21, 2009, apparently in an effort to make Oliver appear strange or eccentric.  On these, the Court will say no more, save that they are irrelevant.

leave, and to reinstatement at the end of FMLA leave.  Presently, HHSC has moved for summary judgment on all of Oliver's claims.

## Discussion

**II.    Summary Judgment—Legal Standard**

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a);  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586.  Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are

not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## II.     Summary Judgment—Application

HHSC has moved for summary judgment on all three causes of action asserted by Oliver. Because they are so closely intertwined, the Court will address Oliver's ADA and RA claim together, before turning to her FMLA claim.

## A.     ADA and RA Claims

Oliver asserts causes of action for disparate treatment, failure to accommodate, harassment, and retaliation, all under one or both of the ADA and RA. The Court will address each claim in turn.

## 1.     Disparate Treatment

The ADA and RA are closely related: "[j]urisprudence interpreting either section is applicable to both." *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000). The Court accordingly considers both together here.

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In order to make out a prima facie case, an ADA plaintiff must show that: (a) she has a disability; (b) she is a qualified individual for the job in question; and (c) an adverse employment decision was made because of her disability. *Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1024 (5th Cir. 1999) (citing 42 U.S.C. § 12112(a)).

Similarly, the RA provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794; *see also Chandler v. City of Dallas*, 2 F.3d 1385, 1389 (5th Cir. 1993). The purpose of the RA is to guarantee equal treatment for the disabled. *See id.* "To qualify for relief under the Rehabilitation Act, a plaintiff must prove that (1) [s]he is an 'individual with a disability'; (2) who is 'otherwise qualified'; (3) who worked for a 'program or activity receiving Federal financial assistance'; and (4) that [s]he was discriminated against 'solely by reason of her or his disability.'" *Hileman v. City of Dallas*, 115 F.3d 352, 353 (5th Cir. 1997) (quoting 29 U.S.C. § 794(a)). The plaintiff bears the burden of proof as to all four elements. *Chandler*, 2 F.3d at 1390.

Under either Act, discrimination may be proved by either direct evidence, or circumstantial evidence alone. *See Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 397 (5th Cir. 1995). Where circumstantial evidence alone supports the discrimination claim, courts apply the burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green. Id.* (citing

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). This framework first requires that the plaintiff establish a prima facie case. *Id.* The employer must then respond with a "legitimate nondiscriminatory reason," supported with evidence, for its actions. *Id.* If the employer meets its burden of production, and advances a nondiscriminatory reason, the plaintiff bears the burden of persuasion to demonstrate the employer's reason was a mere pretext. *See id.*

For purposes of summary judgment, HHSC does not contest whether Oliver was disabled during the events in question, or that Oliver was qualified for her position. HHSC also admits it receives federal funding. Rather, the only issues before the Court at this stage are whether Oliver was discriminated against solely because of her disability (an element of her RA claim), or, similarly, suffered an adverse employment action which was motivated by her disability (an element of her ADA claim). Because the record in this case precludes either element as a matter of law, the Court must render summary judgment for HHSC as to both claims.

A memorandum from Nelson to Oliver, dated January 27, 2009, neatly summarizes some of the legitimate reasons HHSC had for terminating Oliver: "In sum, you are a probationary employee with up to 140 hours' worth of attendance lapses. This is in addition to *ten separate documented* instances of your sleeping in the office." App. to Defs.' Mot. for Summ. J. [#14-14], Ex. 11, at 3.

Both of the foregoing are legitimate, nondiscriminatory reasons to terminate an employee. Both reasons arose *prior* to Oliver's collapse at work on January 21, 2009, and prior to her request for reasonable accommodation, made on January 20, 2009, which was undisputedly HHSC's first notice of any of the various health issues Oliver asserts constitute a disability. Both problems—sleeping at work, and documenting absences—were brought to Oliver's attention at the meeting between Oliver and Nelson on January 5, 2009; they were not cobbled together in

contemplation of litigation.  There is thus no relevant or competent evidence of pretext, as it is beyond belief that HHSC would manufacture a pretext *before* being aware of an employee's disability.  *See Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 163 (5th Cir. 1996) ("To prove discrimination, an employee must show that the employer knew of such employee's substantial physical or mental limitation.").

Oliver's response asserts she was denied access to records which would allow her to address her apparent absences, and she argues this is evidence of discriminatory intent.  In the end, Oliver can only point to the temporal proximity of the events in question as evidence of discrimination.  However, temporal proximity alone, while it can create an inference in some cases, cannot alone carry a plaintiff's burden of proof when an employer has advanced legitimate, nondiscriminatory reasons for the adverse employment action in question.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001).  Although *Clark* is a Title VII case, it is instructive on the issue of causation supported only by a temporal inference.  In *Clark*, much as in this case, the employer had already begun to contemplate, for legitimate reasons, an adverse employment action when the employee first engaged in protective activity.  *Id.* at 271–72.  The Supreme Court noted: "Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."  *Id.* at 272.  Here, HHSC has presented consistent and uncontroverted evidence showing that (1) Oliver had serious employment issues, (2) Nelson was aware of these issues, (3) Nelson discussed terminating Oliver with Human Resources as a result of these issues, and (4) met with Oliver to discuss these issues, with a further discussion planned for the end of January 2009.  And all of the foregoing occurred *before* Oliver filed a request for

accommodation, and before Oliver collapsed at work.  As such, Oliver's reliance on temporal proximity fails, because her termination was already being considered prior to HHSC having any notice she might have a disability. *See id.*  Put in a more colloquial fashion, the termination train had already left the station well before January 20.

Of course, even legitimate reasons can become pretext, when the true motivation behind an adverse employment action is unlawful discrimination.  However, Oliver has put forth no evidence, either direct or circumstantial, of such unlawful intent.  Oliver argues the directions given by Nelson, in the January 27 memorandum, to direct all future communications to Houston, were somehow discriminatory; she apparently believed this would "poison" her supervisor, (who she had scarcely yet worked under), against her.  However, this act, standing on its own, does not give rise to any discriminatory inference.  Other than Jordan, a fellow Attorney IV, and a "peer team lead," Houston was undisputedly Oliver's most direct supervisor at the time.[6]  Simply put, neither the ADA, nor the RA, protects at-will or probationary employees from being terminated for sleeping on the job, or for failure to document absences.  Because the record conclusively shows these legitimate reasons motivated Oliver's termination, and is simultaneously devoid of evidence of unlawful, discriminatory intent, the Court must grant summary judgment for HHSC on Oliver's discrimination claims under the ADA and RA.

---

[6]Furthermore, although the Court has avoided belaboring this issue, because it is mostly irrelevant, the following is noteworthy here: Oliver had been, in rather curious fashion, calling, texting, and emailing several coworkers, at all hours, on the day of the cardiac event and days thereafter.  Nelson had received complaints about this, and no doubt had an understandable—and legitimate—desire to have Oliver communicate through proper channels.

**2.     Failure to Accommodate**

"When a qualified individual with a disability requests a reasonable accommodation, the employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation." *EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 471 (5th Cir. 2009) (citing 29 C.F.R. pt. 1630, App., § 1603.9)). As the Fifth Circuit has explained, the accommodation need only be reasonable, not the employee's preferred accommodation. *Id.* Both sides share responsibility for arriving at an accommodation through the interactive process. *Taylor*, 93 F.3d at 165. However, the employee bears the initial burden to "specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Id.*

Here, HHSC, in the person of Nelson, was first made aware of Oliver's asserted disability through the January 20, 2009 request for accommodation. As such, as a matter of law, there was no failure to accommodate prior to that date.[7] Subsequently, the record demonstrates that, far from ignoring Oliver's request for accommodation, HHSC attempted to address her requests, but ultimately the process was terminated by Oliver herself.

In her January 20 letter, Oliver requested four accommodations:

1. Specific weekly work goals and tasks for each 40-hour week;
2. Flexibility in the days and times she was required to be on duty;
3. The ability to work from home when needed;
4. Specific details on "reporting requirements.

App. at 139. No medical documentation was supplied along with this request. Nelson responded

---

[7]It is worth noting that, far from shirking its duties under the disability laws, HHSC actually suggested to Oliver that she put in a request for accommodation, if she felt her sleeping episodes were the result of any medical problem. This was done by Nelson at the January 5 meeting. *See* App. at 68. But Oliver declined to do so, at least until her January 20 letter.

in detail, noting that, to the extent such was possible, requests 1 and 4 were already being provided. She concluded, in light of Oliver's medical condition (which had first manifested on January 21, the day after Oliver wrote her letter), Requests 2 and 3 were not feasible. Specifically, Request 2, flexible working hours and days, would be dangerous for Oliver, since she could not safely be at work alone, because based on her own representations and the medical information she had provided, she might suffer further episodes of blacking out or other cardiac issues. Nelson communicated to Oliver that Request 3 was unfeasible, because the sanctions cases the department worked on involved "box loads of evidentiary documents," for which chain of custody logs must be maintained, and that had to be stored in a secure facility. Accordingly, HHSC policy apparently did not permit removal of such documents from the building. Nelson also noted the only medical documentation provided at the time was Oliver's FMLA authorization, in which Oliver's treating physician opined she "could not perform work of any kind." *Id.* at 175–76. Oliver failed to substantively pursue the interactive process further. Although the parties dispute which medical documentation Oliver provided, and when, Oliver has put forth no evidence raising a disputed issue of fact as to any further discussion of appropriate accommodation. As such, summary judgment for HHSC is proper on this point.

**3.    Harassment**

The Court need not linger long on this claim. Although workplace harassment is actionable under the disability statutes, *see Flowers v. S. Reg'l Phys. Servs. Inc.*, 247 F.3d 229, 234–35 (5th Cir. 2001), Oliver has shown no evidence of any alleged harassment which occurred after January 20, the earliest date anyone at HHSC was on notice she might be disabled. Her principle complaint, that she was subject to "ribbing" from coworkers, arises from comments made prior to her January 20

accommodation letter, and her collapse on January 21. As such, there is no issue of fact on this point.

Furthermore, in order to be actionable, "the disability-based harassment must be sufficiently pervasive or severe to alter the conditions of employment and create an abusive work environment." *Id.* at 236. Even taken collectively, and viewed in the light most favorable to Oliver, the supposedly harassing acts she points to do not meet such a standard. At that point, the only health issues Oliver had disclosed to Nelson were lupus, and some unspecified back problems, sometime in November 2008. Nelson had apparently therefore allowed Oliver to work lying down in her office, with the door closed. This allegedly resulted in the "ribbing" from her colleagues. App. at 258. She also complains of apparent "disdain" from Nelson, and that Nelson was not available to meet with her when Oliver had work questions. She also asserts, in conclusory fashion, that she was subject to ostracism from her colleagues for unspecified, alleged disclosures of her personal medical information by Nelson to coworkers. Nelson cites no authority to support her claim that such issues, unconnected to any knowledge on the part of her employer that she might be disabled, amounts to the type of continuous and severe workplace harassment which is actionable under the ADA or RA. To the contrary, the record shows Oliver was practically invited by both Nelson and Garbarino to request accommodation under the Acts, if such was medically warranted. The Court grants summary judgment to HHSC on this claim.

### 4.   Retaliation

As with her discrimination claim, other than making purely conclusory accusations, Oliver can only point to the temporal proximity of the events in question in support of a retaliation claim. For the reasons given above, this claim likewise fails. See *Strong v. Univ. Healthcare Sys., LLC,* 482

F.3d 802, 808 (5th Cir. 2007) ("Again, temporal proximity alone is insufficient to prove but for causation [of retaliation].")

## B.    FMLA Claim

### 1.    Provision of Leave

Oliver's FMLA claim is unclear from her pleadings. If she is claiming HHSC failed to provide the full twelve-weeks leave she is entitled to under the Act, then she has failed to raise an issue of disputed, material fact: HHSC's evidence demonstrates conclusively that Oliver was according the full twelve weeks before she was terminated. Specifically, Oliver's last day at HHSC was January 21, 2009 (the day she collapsed at work), and she was terminated on April 16, 2009. *See* Defs.' Supplemental Brief [#29], Ex. A. Even if January 21 and April 16 are excluded from the count, that period constitutes eighty-four days, which simple division shows is twelve weeks. Oliver has failed to adduce any evidence to the contrary, therefore, HHSC is entitled so summary judgment on this claim.

Oliver has also argued, without presenting evidence, or much explanation, that the emergency paid leave HHSC twice provided her during her FMLA period made her ineligible for short-term disability benefits, and seems to imply this is somehow an FMLA violation. However, Oliver has put on no evidence, other than her own speculation, that this occurred, nor cites any on-point authority for such a cause of action.

### 2.    FMLA Discrimination and Retaliation

FMLA discrimination and retaliation claims are governed by a similar analysis to that which applies in ADA and RA cases. *See Mauder v. Metro. Transit Auth. of Harris Cnty, Tex.*, 446 F.3d 574, 583 (5th Cir. 2006). To establish a prima facie case, the employee must demonstrate: "(1) she

was protected under the FMLA; (2) she suffered an adverse employment decision; and either (3a) that she was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because she took FMLA leave." *Hunt v. Rapides Healthcare Sys. LLC*, 277 F.3d 757, 768 (5th Cir. 2001). The *McDonnel Douglas* burden shifting likewise applies. *See Richardson v. Montronics, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005). The employee need not show her protected activity was the only cause of the adverse employment action. *Mauder*, 446 F.3d at 583. HHSC concedes, for summary judgment purposes, all elements except whether Oliver can meet the burden of persuasion to show HHSC's stated reasons for terminating Oliver were mere pretext. Oliver has not pointed to any comparators who were treated more favorably. The Fifth Circuit's opinion in *Mauder* is squarely on point. In *Mauder*, the employee filed for FMLA leave while under probationary status, just as Oliver did. *See id.* The employee was likewise aware that he had to improve documented work-performance issues, or face possible termination, as Oliver was after her meeting with Nelson on January 5, 2009. *See id.* The employer in *Mauder* was therefore "not required to suspend Mauder's termination pending his FMLA filing." *Id.* at 585. There being no additional evidence, other than assertions of temporal proximity, Mauder failed to "put the ball back in Metro's court; he has not met his burden of proof on this issue, and he does not raise an issue of fact as to whether Metro's reasons for his termination are a mere pretext for his supposed retaliatory discharge." *Id.* Here as well, Oliver has failed to adduce evidence to raise a fact issue as to pretext. In fact, the evidence which *is* before the Court is entirely inconsistent with discrimination or retaliation: HHSC twice granted Oliver substantial periods of unpaid leave, the first being a month's leave, commencing on January 27, 2009, and the second after Oliver attempted to

return to work on March 23, 2009, lasting until her termination on April 16. Therefore, summary judgment for HHSC is mandated on this claim.

### 3.  Reinstatement

Oliver's new argument, squarely raised for the first time in response to HHSC's Court-ordered memorandum, appears to suggest that she invoked her FMLA right to reinstatement when she made her brief, surprise return to work on March 23, 2009. This argument fails as well, for three reasons, discussed below.

First, although the FMLA gives employees the right to be restored "to the position of employment held by the employee when the leave commenced" or to "an equivalent position," 29 U.S.C. § 2614(a)(1), that right is not absolute. Relevant here, the employee must be able to perform the job in question in order have a right to reinstatement to it:

> If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition or an injury or illness also covered by workers' compensation, the employee has no right to restoration to another position under the FMLA. The employer's obligations may, however, be governed by the Americans with Disabilities Act (ADA), as amended.

29 C.F.R. § 825.216(c).

Oliver has presented no evidence from which a finder of fact could reasonably infer her ability to perform the essential functions of her position. Rather, a great weight of evidence indicates she was unable to perform her job, either when she attempted to return on March 23, 2009, or when she was terminated on April 16, 2009, or, indeed, even before she suffered her cardiac event.

Second, the record demonstrates HHSC would have terminated Oliver even if she had not been forced to take FMLA leave, and Oliver has raised no evidence to the contrary. "The right to

reinstatement provided by the FMLA is not absolute, however, for the statute does not confer benefits to which an employee would not be entitled had the employee not taken leave. Thus, employers may fire employees for poor performance if they would have fired them for their performance regardless of their having taken leave." *Ogborn v. United Food & Commercial Workers Union, Local No. 881*, 305 F.3d 763, 768 (7th Cir. 2002) (citations omitted). Here, the record conclusively demonstrates Oliver would have been fired even if she had not taken leave. Oliver was a probationary employee, and, as such, she had no contractual or legal protections beyond those afforded to any other at-will employee in the state of Texas. Oliver argues she was prevented from adequately "mining" the evidence pool to justify her various absences, but whether or not Oliver could reconstruct explanations for the various apparent absences is beside the point. At the meeting between Nelson and Oliver on January 5, 2009, Nelson informed Oliver of—and Oliver undertook to comply with—the following requirements, among others: (1) to review her AccessHR entries, and make any additions or corrections necessary to accurately reflect prior absences, and (2) to maintain her Outlook Calender to reflect leave and other appointments, such that it could be reviewed by her Team Lead. App. at 135. Instead, Oliver (1) failed to make any corrections to her AccessHR entries, and (2) rather than maintaining her Outlook Calendar, she proceeded to adjust its settings so that her Team Lead could no longer view it. *Id.* at 136.

Also at the January 5 meeting, Nelson advised Oliver that a follow-up meeting would occur on January 30 to address Oliver's progress in correcting the various issues. After Oliver collapsed at work on January 21, Nelson extended her time to respond to the AccessHR discrepancies by February 11. Oliver made various responses on both February 11 and 22. In her responses, she disputed the methodology Nelson used in specifying which dates required clarifications, attempted

to explain any discrepancies where possible, and stated that she no longer wished to work under the supervision of either Nelson or Houston. *Id.* at 162 ("I hereby formally and respectfully request that I be allowed to work in a Division or Section wherein neither of you are in my chain of command."). This last alone is an ample, legitimate reason to terminate a probationary employee, particularly since there were no other supervisors in the Sanctions department for Oliver to work under.

To be clear, the Court expresses no opinion on whether Oliver actually was absent on any particular date, or whether Nelson was justified in subjecting Oliver to such detailed questioning on her attendance.[8] The simple fact is, Oliver was an at-will, probationary employee. Her employer had a stated employment policy, requiring Oliver track any absences in the AccessHR program. She failed to comply with this policy, and then failed to become compliant when directed to do so. The record reflects that HHSC considers such failures to be very serious, and meriting termination, and that the only reason Oliver was not terminated earlier was because she was on FMLA leave.

The record also shows that Oliver could not perform the job in question: as part of her request for accommodation, she demanded detailed supervision, including a weekly list of which projects should be worked on, in priority order. But the Attorney IV role Oliver was hired for was an experienced attorney position, requiring independent judgment, and the ability to operate under one's own initiative—Oliver could not simultaneously require weekly hand-holding, and still fulfill the job requirements.

---

[8]Nelson has asserted that a simple confirmation by Oliver, as to each disputed day, representing Oliver had been present during scheduled working hours would be enough. However, the wording of her memorandum to Oliver, containing the request for a detailed accounting, gives little hint she would be so forgiving. However, it is immaterial here whether Nelson was harsh or reasonable in her expectations.

Taken together, or independently, the four foregoing issues (sleeping on the job, failure to record absences in AccessHR, Oliver's refusal to work under Nelson or Houston, and Oliver's request for detailed, weekly supervision) show Oliver would have been terminated regardless of her FMLA leave. As such, she had no entitlement to reinstatement under the Act, and her claim alleging HHSC violated the FMLA fails as a matter of law. *See Ogborn*, 305 F.3d at 768.

Thirdly, summary judgment as to Oliver's FMLA claim is also proper because Oliver has failed to raise a fact issue as to any possible damages. The FMLA's remedial provisions state:

> An employer who violates section 2615 of this title shall be liable to any eligible employee affected . . . for damages equal to . . . the amount of . . .
> (I) any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or
> (II) in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation.

29 U.S.C. § 2617(a)(1)(A).

Oliver has submitted no evidence, nor articulated any argument, which would demonstrate either lost compensation due to HHSC's actions, or any other "actual monetary losses" sustained as a result. Had HHSC allowed Oliver to return to work beginning on March 23, 2009, the record evidence conclusively demonstrates she simply would have been terminated that much sooner, rather than on April 16, and thus would not have received the additional paid emergency leave HHSC provided, beginning on March 23.

Finally, the following is also significant: in a letter dated January 27, 2009, Nelson informed Oliver that her six-month probationary period would be tolled while on emergency leave. Such policies are permitted by the FMLA statute, which limits its coverage as follows: "Nothing in this section shall be construed to entitle any restored employee to-- (A) the accrual of any seniority or

employment benefits during any period of leave; or (B) any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."  29 U.S.C. § 2614(a)(3).  As such, HHSC's policy, and the application of that policy to Oliver, tolling her probationary period while on FMLA leave, were lawful under the Act.

### Conclusion

Because Oliver has failed to meet her burden to show at least a disputed issue of material fact as to each of the challenged elements of her various claims, HHSC is entitled to summary judgment for all causes of action.

Accordingly:

IT IS ORDERED that Defendants Texas Health and Human Services Commission and Thomas Suehs's Corrected Motion for Summary Judgment [#18] is GRANTED;

IT IS FINALLY ORDERED that all other pending motions are DISMISSED as MOOT.

SIGNED this the _26_ day of March 2012.

SAM SPARKS
UNITED STATES DISTRICT JUDGE

821 msj ord jih.frm                                 -23-